## THE MARYLAND SAVINGS INSTITUTION *vs.* JOHN SCHROEDER.—*June,* 1836.

The depositor of a sum, weekly, in an incorporated Savings Institution, which he was entitled to withdraw at pleasure, agreed with and requested the institution to convert and vest his deposites permanently into stock of said company. Upon the conversion he received increased dividends and participated in its entire profits. The institution becoming insolvent, and receiving in the course of its settlements with its debtors, its own certificates of deposite in payment, which would absorb all its available funds.

The depositor on the ground that a conversion of his money into stock was in violation of the charter of the company, applied for an injunction. *Held, that whether the charter authorized it or not, he was not entitled to the restraining power of the court.*

An application to a court of chancery for the exercise of its prohibitory powers or restrictive energies, must come recommended by the dictates of conscience and be sanctioned by the clearest principles of justice.

Where a party reaps profits by his own voluntary act, founded upon contract with another, he is not as against the creditors of such other party at liberty to vacate his contract to their prejudice, and claim to participate in equity and conscience, upon the insolvency of such other party, equally with his creditors in his estate and in opposition to the terms and effect of the original agreement.

A court of equity decrees the specific execution of a parol agreement, on the ground of part performance, and notwithstanding the express provisions of the statute of frauds. This is on the ground of fraud in refusing to perform after performance by the other party, and to prevent the statute from being an engine of that fraud, which it was enacted to prevent.

APPEAL from the court of *Chancery*, and from an order granting an injunction upon bill and answer.

On the 24th December, 1834, *John Schroeder* filed his bill in Chancery, charging, that at December session, 1826, *The General Assembly of Maryland*, passed an act incorporating certain persons, and all other persons becoming members of *The Maryland Savings Institution*, a body politic ; granting them among other powers, that to regulate the manner of making and receiving deposites, the forms of certificates to be issued to depositors, and the transfers thereof—to provide for the investment of funds and admission of members. That the said corporation by its charter, was capable of receiving from any free person or persons any deposite of money, and that all money so received should be invested in public stocks or other securities, at the discretion of the directors, and in the manner deemed most safe and beneficial ; and prohibiting expressly the loan of any of the said funds to any officer or director of said corporation. That in every year the directors should make a dividend of profits and pay the same to the depositors. That the said corporation was prohibited from doing any act inconsistent with the privileges secured to the existing banking institutions of the *State*

That the company was organized, and under the third and fifth sections of the first article of the by-laws, the complainant became a weekly depositor and so continued, until the receipt of a circular from the treasurer of said institution, he was required to discontinue depositing, at which time his deposites amounted to $520. That the depositors upon receipt of said circular did submit to the proposition contained in the resolution set forth therein, to change the original character of their deposites, though the same was *not* done of their free will or advisedly, but in consequence of the penalty attached by the resolution aforesaid to a non-compliance with the law referred to therein, and that the depositors did not thereby intend or design relinquishing their character and claims as depositors, and that said resolution and by-laws were void ; that loans were made to directors and officers of the said corporation ; that said resolution and by-laws were made to conceal such loans and in fraud of the right of depositors ; that the certificates issued by such corporation bearing interest are void, and were entered into to enable said company to use banking privileges contrary to its charter, through the aid of the sums deposited ; that it did in fact erect itself into a bank, and assumed banking powers in the discounting of notes and circulation of bank paper ; that complainant never became a member of such corporation ; that said corporation is insolvent and in May, 1834, suspended payment ; that complainant is a depositor in said company and claims to be entitled to the amount of his deposite, either to the exclusion of the holders of the certificates of special deposite or in common with them, which right the said corporation denies. The bill further charged, that the institution and its directors are engaged solely in settling up its business, and disposing and distributing the funds and effects held by it, which belong to its depositors, and that settlements are continually effected by giving unjust and improper preferences ; that it is paying or intends paying as far as practicable, the whole amount of the certificates of special deposite, whereby all the funds and effects held by said insti-

tution will be exhausted to complainant's utter and irremediable injury.    To the end that equity might be done in the premises by an equal and just distribution of all the funds and effects held by said institution among all its depositors. Prayer for a summons to the company, an answer to the bill, and various special interrogatories, writs of subpœna for the directors, and injunction, and for general relief.

With the bill was exhibited various documents, among others as follows :—

1.  Resolution of the directors of May, 1831.

" Resolved, that the present weekly depositors of this institution terminate their deposites, as they are now received with the current month ; and that they be notified that such deposites will cease to bear an interest, or be entitled to a dividend of the profits of the institution after the first day of December next, unless they are in the meantime converted into permanent stock of the institution in conformity to the following bye-laws."

*Extract from the By-laws.*

Every weekly depositor desiring to make a permanent investment of his, her or their deposites, or any adequate portion of them may at his, her or their option, by subscribing an agreement to that effect in a book to be provided for that purpose, convert the same into a share or shares of stock of the par value of twenty-six dollars each, which share or shares shall be transferable on a book to be kept in the institution by the holder in person or attorney.    Which stock shall vest by devise or administration on the death of the holder in the legal representative of such holder.    But no such investment, nor any transfer of such stock, shall be permitted to be made by a married woman, or any person under the age of twenty-one years, nor shall any deposites after being so converted into stock, be subject to be withdrawn.    And all shares of stock shall be entitled to dividends of the profits made in the institution.

2.  The third and fifth sections of the by-laws referred to in complainant's bill.

Sec. 3. Any person or persons wishing to become a depositor or depositors shall apply at the institution, and having approved of the charter and by-laws shall signify his, her or their assent thereto, by signing the same, at which time each depositor or depositors shall affix to his, her or their name, the sum proposed to be deposited weekly by him, her or them, the same not being less than one dollar, and whatever sum shall be thus affixed to each name, shall be paid at the time of subscribing, and shall continue to be paid into the institution weekly thereafter, so long as the person or persons agreeing to make such deposite shall be connected with the institution.

Sec. 5. Any person or persons who shall agree to become a weekly depositor or depositors in this institution, shall deposite such sum as may be affixed to his, her or their names at the institution on Monday of each week, during such time, being not less than five hours, as the institution may be kept open for the transaction of business; and if any person or persons shall neglect, omit or refuse to make his, her or their weekly deposite, at the time required hereby, he, she or they, as the case may be, shall be fined in the sum of six and a quarter cents weekly, for each and every dollar so remaining unpaid; provided nevertheless, that nothing herein contained shall be construed to oblige any one to continue his, her or their deposites, who may have signified an intention to withdraw from the institution agreeably to the conditions hereinafter provided.

3. Notice from the directors of their design to receive certificates of special deposite in payment of debts due the institution.

4. A form of the certificates of special deposite.

On the filing of this bill and exhibits, the Chancellor, (*Bland*) on the 24th December, 1834, ordered that the application for an injunction should stand for hearing, with or without all or any of the answers, on the 14th January, 1835, provided a copy of the order and bill be served on each one of the defendants on or before the 3d January,

*The Maryland Savings Institution* answered the bill, and alleged that the said institution having transacted business up to May, 1831, and received from weekly depositors a large amount, and having also received on deposite from individuals at four or five per cent. interest, it was thought expedient for the security of the existing engagements of the company, that it should be proposed to said weekly depositors to waive their privilege of withdrawing, as allowed by the by-laws, their deposites, and to agree that the same should be permanently, until the expiration of its charter, retained by said corporate body and assume the form of capital stock, and be divided as such into shares for the convenience of transfer ; that in pursuance of this view, the directors did pass a resolution and by-law exhibited with the bill, that the plaintiff conformably thereto, assented to continue his weekly deposite fund in the said institution, and to convert the same into the form of capital stock, and did so of his own free will and in writing, that such arrangement took place with others to amount of $242,835, and that no restraint or coercion was used to compel it; that it was entirely optional with complainant as with other depositors to accede to it or not, and that said conversion was not planned or proposed with a view to the concealment of any fraud practised by the directors on the rights of depositors, or to exercise banking powers ; that this conversion having been generally and notoriously accomplished, the directors proceeded on its basis to attract business and public confidence, and special deposites to the amount of $229,176 50, made since that conversion ; that the complainant always knew that special deposites were so taken; that increased dividends were declared and received by complainant, from eight to ten per centum.    The notice No. 3, *ante*, was admitted, but the insolvency of the company in relation to creditors was denied, and it was also denied that they had received certificates of special deposite in any other way than as payment for debts due, or that they have given any improper preferences.    The answer relied upon the acts and doings of the complainant

as a bar to his complaint. Various other matters of defence not strictly responsive to the bill were also stated, but which the reporters do not deem material to the question decided by this court.

The defendants exhibited with their answer the following document signed by the complainant.

" The undersigned weekly depositor in *The Maryland Savings Institution*, do hereby agree and request, that $520 of my present deposite in the said institution may be converted to and vested permanently in twenty shares of stock of *The Maryland Savings Institution*, in my name. Given under my hand the 28th June, 1831. JOHN SCHROEDER."

On the 27th January, 1835, the complainant with many other stockholders in said institution, filed an amended bill charging that the present board of directors thereof, or a majority of them, were elected by the former board, after the institution had suspended and was known to be insolvent, by the members thereof severally and successively resigning in order to create vacancies, which the remaining ones filled up, thus making the present board; that the present board was constituted for the sole and avowed purpose of settling up the affairs of the said institution, and not to transact the business authorized by its charter, and that the present board considered themselves trustees for the purpose of collecting and distributing the affairs of the company; that the said institution is so entirely insolvent as to be utterly unable to resume its business; that the supplemental charter of 1834, ch. 185, was never accepted by the institution, and that the complainants are therefore not members of said institution, and have done nothing to procure or accept said law. Various documents were filed with the amended answer to show the insolvent condition of the company.

The answer of the new board of directors to the amended bill re-asserted, that the change from weekly deposites to stock was made with full knowledge, freely and voluntarily by the principal part of the depositors, the receipt of increased dividends by them; that some of the former board of

directors had borrowed the funds of the institution, previously to the passage of the resolution converting deposites into stock, but that no loss can yet be traced therefrom; that such resolution was not adopted for the purpose of concealing that the company had invaded the banking privileges of other corporations; that certificates of special deposite had been issued in the forms as charged; that complainants became and were members of the institution and voted as such; that the new board of directors were appointed in good faith and upon the request of the stockholders; that the institution is not insolvent and they believe it will pay its depositors; that no new business was transacted; that the new directors have been occupied in settling its affairs, and have received the certificates of deposite in payment only; that no unjust and improper preferences have been allowed; that the complainant and others as stockholders are not entitled to a dividend of the assets of the corporation, in common with the creditors thereof; that such a principle of distribution would be unjust if not fraudulent towards creditors; various matters not material to the questions ultimately decided were also set forth in said answer, showing the condition of the accounts between the institution and *The United States Insurance Company*, and *The Susquehanna Bridge* and *Bank*. The exhibits with the original and amended answers were not denied.

On the 3d February, 1835, the Chancellor, (*Bland*) ordered a writ of injunction to issue, directed to *The Maryland Savings Institution*, its directors, agents and servants, commanding and enjoining it and them forthwith to surcease, give over, and refrain absolutely from paying, parting with, disbursing, releasing or remitting any money, or any of the funds which belonged to it, or were held by said institution, on or before the 6th day of May, 1834; except in so far as may be necessary to demand, sue for, get in, recover and collect, all or any of the said moneys, funds, effects, property, rights or credits, claimed by or belonging to said institution; and

safely to keep and hold the same, until the final hearing of this case or the further order of this court.

From which order the defendants prayed an appeal.

The cause was argued before BUCHANAN, Ch. J. and STEPHEN, ARCHER, and CHAMBERS, Judges.

D. STEWART and MAYER, for the appellant, contended:

1. That the corporation had the power to pass the resolution and by-law of May, 1831, under the third and fourth sections of their charter, which was created by the act of 1826, ch. 189, and that the conversion of the deposites into stock was a legitimate exercise of power. It was a due exercise of the power of investment, which the charter confers in the most unlimited terms.

2. This stock thus created out of the funds of the original depositors, was the security to which the special depositors looked, and it attracted a large amount to the institution. This last class of the depositors placed their funds there upon the faith of that security, and it would be a fraud upon them now to withdraw them. The conversion was made with the consent of the weekly depositors, and from that time to the failure of the bank, they have received annual dividends at the rate of from eight to ten per cent., and these dividends were swollen to that amount, by the employment of the moneys of the special depositors who could not receive more than five per cent. The appellants explicitly deny all the fraud charged in the bill, but independently of such denial there is no pretence for any such allegation. The weekly depositors had ample time given them for deliberation, and after carefully considering the subject, they all consented to the conversion, and continued, until disasters overtook the bank to receive the fruits of the change. With what show of equity therefore can they now complain or ask to be absolved from the consequence of their own act?

3. The supplement of 1833, ch. 135, was to give the privilege of voting to the new stockholders; the appellee and

his associates. To confer upon them the rights of stock-holders, and of course the question of assenting to this modification of the charter, was submitted and assented to by the original members of the association, and these privileges were exercised by the appellee and the rest. This estops him from repudiating the character of stockholder. The contract created by the resolution of 1831, and the act of 1833, was founded upon a valuable consideration. *Little vs. O'Brien,* 9 *Mass. Rep.* 403. *Chester Glass Co. vs. Dewey,* 16, *Ib.* 94. *Bosley vs. McKim,* 7 *Har. and John.* 469. According to the charter of 1826, the special depositors had no security but the bills and notes discounted by the institution. There was no banking capital; but the act of 1833, passed in pursuance of the resolution of 1831, and with the consent of the weekly depositors changed their deposites into stock, and thus placed their funds between the special depositors and loss. It was surely compétent to the legislature to do this, and therefore, whatever may be thought of the resolution, its defects were healed by the act of 1833. There can be no doubt of the power of the legislature to have provided a stock capital by the original act of incorporation, before the money was subscribed; and if so, why may they not convert into stock capital previously subscribed, with the consent of the subscribers ?

R. Johnson and Campbell for the appellee.

The present injunction was granted upon bill and answer, and the unanswered allegations of the bill are to be regarded as true. This is the rule upon motions to dissolve. *Young vs. Grundy,* 6 *Cranch,* 51. *Warfield vs. Gambrill,* 1 *Gill and John,* 510. And upon such motions new matter set up in the answer is not regarded as true. *Minturn vs. Seymour,* 4 *John. Ch. R.* 499. Nor is the answer even when responsive to the bill entitled to full credit, it being the answer of a corporation not verified by oath. *Fulton Bank vs. New York and Sharon Canal Company,* 1 *Paige,* 311. The assumption of banking powers by this corporation was a

violation of the pledge of the *State*, not to increase the banking capital in *Baltimore*, which pledge was expressly saved in the charter. That charter conferred no power upon the corporators to convert deposites into permanent stock, even with the consent of the depositors, nor can such power be implied from the object and scope of the enactment. Its exercise therefore was wholly void. *Kidd on Corp.* 70. *Angel and Aimes*, 59, 60. *New York Firemen's Ins. Co. vs. Ely*, 2 *Cowen*, 709. *North River Ins. Co. vs. Lawrence*, 3 *Wend.* 483, 485. *Life and Fire Ins. Co. vs. The Mechanics' Fire Ins. Co.* 7 *Ib.* 34. 4 *Wheat.* 636. *Beatty vs. Lessee of Knowler*, 4 *Peters*, 171. The rule is, that a corporation cannot claim the benefit of a contract, either as plaintiff or defendant, unless it can show the power to make it, either in express terms, or by fair implication from the charter. And it is the same in effect, if the franchise exerted does not extend to the particular contract set up, as if there was no such franchise at all. In either case the act done is beyond the power of the corporation, and consequently void.

The third and fourth sections are relied upon, as giving the power in question ; but they do not. The power given in the third, to provide for the investment of deposites, is to be taken in connection with the fourth, and means only, that they may select such public stocks or other securities as may be deemed best. If this institution has the right to convert its deposites into banking capital, there is no limit to the amount which may thus be created, for there is none to the deposites which they are authorized to receive, and thus the banking capital may be augmented to an indefinite extent, contrary to the invariable usage of the legislature, which has always been to specify and limit the amount of its capital when a bank is created.

Suppose the case of a bank with a limited capital, but without limit in the use of its credit was to take deposites, and with the consent of the depositor was to convert them into capital, would it not be unlawful ? And why is not the

same thing unlawful, when done by an institution which has no authority to have capital at all?

By the fifth section, the whole profits are to be paid to the depositors. If therefore, the conversion of these deposites into stock is legal, then the owners of them are entitled to nothing, as they lose the character of depositors, and assume that of stockholders for whom no provision is made in the section providing for the distribution of the profits.

But suppose this view is erroneous, and that the depositors whose deposites have been commuted into stock, are entitled to receive the large dividends which it is alleged they have, then the object of the law which contemplates an equality of profits is clearly violated, and for that reason the act of commutation is unlawful. There can be no doubt that the charter intended, that all the depositors should participate equally in the dangers and profits of the concern. It was never designed by the legislature, to be converted into a stock-jobbing machine, liable to be prostituted to the purposes of speculation, and involved in the dangers which are inseparable from institutions which are so employed. The managers of it had no more right to pervert it to such objects, than would chancery trustees be authorized to invest funds, which the court could not at once administer. Security and moderate profits was the end aimed at in the establishment of the institution; not high gains, and the perils unavoidably consequent upon them.

2. The consent of the depositors to the conversion can make no difference. The question still is, was the franchise exerted, conferred by the legislature? If it was not, the act, whether assented to or not, is unauthorized. It is the *State* which is injured whenever a franchise is assumed, which was not granted.

Suppose this institution with the full consent of all the members had issued a fire policy, and taken a note for the premium?

Could the company have compelled the payment of the note, or the assured have recovered upon the policy in case

of loss? Neither could have been done. *Life and Fire Ins. Co. vs. The Mechanics' Fire Ins. Co.*, 7 *Wend*, 34. *The North River Ins. Co. vs. Lawrence*, 3 *Ib.* 482. These cases decide, that to condemn contracts as invalid, it is not necessary to show that they are *prohibited* in terms, provided that in the enumeration of powers in reference to the subject of contracts, other descriptions of contract are mentioned. And they further decide, that it is competent to a party who has received money under a contract to deny its validity.

It has been urged, that the parties are estopped by their consent; but the doctrine of estoppel does not apply when the *public* is concerned as is always the case, when the question is, whether a corporate franchise has been improperly exercised or not.

Even the assignee of a policy of insurance issued by a corporation without authority, cannot recover upon it, though he may have taken it without notice of the defect of power.

3. But suppose the conversion was a legal exercise of power, still the relation of debtor and creditor exists, and in the distribution of the assets of the institution no discrimination can be made between these creditors and any other class. The act of conversion did not make these deposites *capital*, and produced no other change in them, than to deprive the proprietors of the privilege of withdrawing their money at pleasure; and this was further provided for in a by-law, which would not have been the case if they were regarded as mere stockholders, because as such, the right to withdraw their money never exists. The only effect of the change, was to convert temporary into permanent deposites.

The supplement of 1833, was not accepted in the manner pointed out by the law. It was accepted within less than a month from the time of its passage, when not less than three months were required to be given. But if it was duly accepted, it does not change the character of the stock, and make it capital if it was not so before. It does not create or profess to create stockholders, who were not so before. It proceeds upon the assumption that the stock was properly created, but

14    v.8

does not make valid that which was invalid at the time of the enactment.

STEPHEN, Judge, delivered the opinion of the court.

In deciding upon the question presented by the appeal to this court for adjudication, we do not deem it necessary to form or express an opinion relative to the power of the corporation under its charter to make the conversion of the appellee's deposites into stock, because we think that the decision of the court below awarding the injunction is unsustainable upon other grounds, and is in conflict with the soundest principles of equity jurisprudence. An application to a court of Chancery in a case like this, for the exercise of its prohibiting powers, or restrictive energies, must come recommended by the dictates of conscience and be sanctioned by the clearest principles of justice. We are told by *Mr. Maddox*, in his treatise on the principles and practice of the court of Chancery, in 1 *vol.* 104, that an injunction is a prohibitory writ, specially prayed for by a bill in which the plaintiff's title is set forth, restraining a person from committing or doing an act, (other than criminal acts) which appears to be against equity or conscience. This being the character of the writ and the grounds upon which it ordinarily issues, it becomes necessary to inquire, whether the granting of it in this case was calculated to subserve the purposes of justice, and to prevent the commission or doing of an act against the principles of equity and conscience. We think that an attentive examination of the prominent features and circumstances of this case, will leave but little doubt as to the conclusion proper to be drawn as the result of such an inquiry. So far from the complainant having a right to the relief which he asked at the hands of the court of Chancery, we think that there is not any ground of equity in his case, and that his conscience is bound by an equitable estoppel, if not from questioning the right of the corporation to make the conversion of his weekly deposites into capital stock, as a fund for the payment of its debts, at least it is so bound

from making any attempt, to shield the fund so created from a liability to the payment of debts contracted with the institution upon the faith of its responsibility; and more especially as it clearly appears, his interest has been essentially promoted in the shape of dividends by the credit attracted to the institution, in consequence of such conversion. It would no certainly comport with the principles of equity and fair dealing, to permit the appellee to hold out false colours to the world, and by attracting the public confidence to the institution, to realize to himself large profits in the form of dividends on his stock, pledged as a security to the creditors of the corporation, and then to call in aid the powers of a court of equity to protect his interest in said stock from a liability, to which he had voluntarily subjected it, and by which liability he and his associates had been essentially benefitted. We say *voluntarily* subjected it, because the allegations of the bill to the contrary, are in this respect flatly and pointedly contradicted by the answer. It must be borne in mind, that the order for an injunction from which this appeal has been taken, was granted by the Chancellor, not upon the case alone as made by the bill, but upon the bill and answer as well of the corporation or body politic under its corporate seal, as of the president and directors in their private and individual capacities under oath. If therefore the injunction is to be sustained, it must be upon the case as made by the bill and answer, and not by the bill alone. The object of the injunction appears to have been, and its effect and operation, are to prevent the officers of the corporation from paying the special depositors, or receiving their certificates of deposites in payment of debts due to the institution. How far it is warranted by the principles of equity and conscience in such its operation upon their rights and interest, it is the duty of this court now to examine and declare, and we think that in a court of conscience at least, but little doubt can be entertained upon the subject. It is an unyielding and inflexible principle of the court of Chancery, that he who seeks equity ought to be prepared to do equity. Before therefore, the

complainant can enlist the countenance of a court of equity in his favour, he must be prepared to render to these deposi-tors, that full measure of justice which the principles of equity and conscience demand at his hand.   Does his standing before this court, and the relief which he prays in his bill exhibit him in that character and attitude?   We think it does not, and that the injunction which issued in this case ought not to have been granted.   Numerous cases analogous in point of principle to the one now before this court, may be extracted from the books of equity decisions.   They are all decided upon the ground of fraud and imposition, and are intended to uphold and enforce the principles of good faith and fair dealing in the transactions and intercourse of man with man.   A striking and impressive illustration of this doctrine of the court of equity upon such subjects, may be found in 2 *Atk.* 72, where *Lord Hardwick*, that great lumi-nary of the court of Chancery says, there are several instances where a man has suffered another to go on with building upon his ground, and not set up a right till afterwards, when he was all the time conusant of his rights, and the person building had no notice of the other's rights, from which the court would oblige the owner of the ground to permit the person building to enjoy it quietly and without disturbance. Speaking of the same rule of equity, Chancellor *Kent*, in 6 *John. Ch. R.* 168, says, where one having title acquiesces knowingly and freely in the disposition of his property for a valuable consideration by a person pretending to title, and having colour of title he shall be bound by that disposition of the property, and especially if he encouraged the parties to deal with each other in such sale and purchase.   It is deem-ed an act of fraud for a party conusant all the time of his own right to suffer another party ignorant of that right to go on under that ignorance, and purchase the property or expend money in making improvements upon it.

In 1 *John. Ch. R.* 354, Chancellor *Kent*, speaking upon the same subject says, there is no principle better established in this court, nor one founded on more solid considerations

of equity and public utility, than that which declares, that if one man knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such persons. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel.

We think that the principle established by these decisions has a considerable bearing upon the merits of this case. The appellee after having consented that his deposites should be converted into stock, as a fund or security for the debts of the institution, and after having encouraged their special depositors to deal with the institution upon the faith of such responsibility, now endeavours to withdraw the fund from the pledge and liability to which he had voluntarily subjected it ; and claims to stand in a court of equity upon an equal footing with them in the teeth of such, his solemn engagement to the contrary. We think in the language of the authority just referred to, that it would be an act of fraud and injustice in him ; that his conscience is bound by an equitable estoppel. Whether the corporation had a right to make the conversion against his will and consent, under the powers derived from their charter, it is not necessary now to decide ; nor do the merits of this controversy depend upon the solution of that question. The agreement to convert is to be received as a contract with each depositor, who trusted his money to the corporation upon the faith of it, that his stock should be liable to such depositor as a fund for the payment and satisfaction of his claim. To such purpose the stock of the appellee must be considered as voluntarily dedicated by him ; and it would we think, be repugnant to the soundest principles of equity and justice to sanction the attempt which is now made, to wrest it from the destination and purpose for which it stands pledged by his own solemn engagement, and thereby inflict a most serious injury upon those whose only fault has been a misplaced confidence in the sincerity and inviolability

of his promises and professions.   To such an attempt, we think that a court of Chancery in the exercise of its equity powers ought to lend no assistance ; and that such a suitor should be turned from its doors to seek redress any where, rather than in a court of conscience.   Why is it that a court of equity decrees the specific execution of a parol agreement on the ground of part performance, and notwithstanding the express provisions of the statute.   It is on the ground of fraud in refusing to perform after performance by the other party, and to prevent the statute from being an engine of that fraud, which it was the object and policy of its enactment to prevent.   Upon the whole we are clearly of opinion, that whether the corporation had the right to convert the weekly deposites into capital stock or not, still we think that the injunction under the circumstances of this case should not have been granted, and that the order granting the same ought to be reversed.   We consider the fund arising from this conversion of the weekly deposites into stock by the depositors with their own consent, to be in the hands of the corporation as trustees for the special depositors as creditors of the institution, they having become such upon the faith of it, and that a court of equity ought not to interpose to withdraw it from the destination to which it has been thus solemnly pledged.

ORDER REVERSED.